ALLEN COMPANY, Inc. and Great American Ins. Co., Petitioners,

v.

Hazel GRUBB and the State Industrial Court of the State of Oklahoma, Respondents (two cases).

Nos. 42270, 42271.

Supreme Court of Oklahoma.

April 2, 1968.

Rehearing Denied July 2, 1968.

Houston, Klein & Davidson, Ronald Main, Tulsa, for petitioners.

Harry R. Palmer, Jr., Schwoerke & Schwoerke, Oklahoma City, Charles R. Nesbitt, Atty. Gen., for respondents.

LAVENDER, Justice.

There is involved here for review awards entered by the State Industrial Court in causes Nos. D–33872 and D–35544, said court. Both claims arise out of alleged accidental injuries sustained by one Robert L. Grubb while working at a hazardous employment for the petitioner, respondent below, Allen Company, Inc., at its plant in Tulsa, Oklahoma, on October 9, 1964. Robert L. Grubb died on May 10, 1965, and will be hereinafter referred to as "deceased". Other parties will be referred to as they appeared before the State Industrial Court.

In Case No. D–33873 the State Industrial Court entered an award for temporary total compensation together with medical expenses. In Case No. D–35544 the court entered an award in favor of the widow for the death benefits allowable pursuant to the Workmen's Compensation Act. The respondent and its insurance carrier, who are the Petitioners in this court, appealed to the Industrial Court en banc and upon an order of that court sustaining the award, the Petitioners have brought this action for review.

The facts and petitioners' contentions are equally applicable as to both cases. The cases were consolidated in this court for briefing and disposition.

Respondent admits the deceased was employed by it on October 9, 1964, and on said

date worked for a period of four hours, from 8 A.M. until noon. It denies that deceased was injured while so working and asserts that the injuries sustained by the deceased, if any, and his subsequent death were the result of injuries sustained elsewhere or from other causes and not during the course of his employment for respondent.

In narrative form the evidence is as follows:

Deceased reported for work about 7:30 A.M. on Friday, October 9, 1964, and worked until 12:00 noon. As deceased was leaving the plant, he had a conversation with the workmen for a neighboring companion company of the respondent. One of these workmen testified:

"Mr. Pierce and I were sitting there eating our lunch and Mr. Grubb came out. I said, 'How are you, Bob?' and he said, 'Well, I'm not doing too good,' and I said, 'What's the matter, are you sick?' He said, 'No, I raised up under that old unit back there and bumped my head.' I said, 'Well, a bump that way kind of hurts once in awhile.' That's all that was said and he went on up, I suppose where he had parked his car west of there."

His testimony is corroborated by the other workman. Both witnesses recalled the incident, but could not remember the exact date it occurred. They both testified deceased did not complain of pain and they watched deceased as he walked to his car and observed nothing unusual about his gait or appearance.

About 2:30 P.M. in the afternoon, deceased was observed coming out of a Safeway store. He staggered backward and a witness had to catch him to prevent his falling. This witness observed no apparent injury to the deceased.

The deceased drove his car from the plant to his home. He arrived home about 3:00 P.M. Mrs. Grubb testified that deceased had a funny look about him, was real pale, his eyes all bugged out, and he seemed to be shaky and dizzy. She examined the top of deceased's head and found a puffy, swollen, bleeding abrasion. She put some medicine and a cold towel on the abrasion. Deceased went to bed in about an hour. He spent a restless night. In going to the bathroom he would stagger and catch hold of things to support himself.

Deceased slept a portion of the next morning, Saturday, October 10, 1964, and watched the World Series on television. In the afternoon he went to Alfred's Alibi Bar to ascertain the winner of the "jackpot" on the baseball game.

An attendant at Alibi Bar testified that deceased came into the bar; that he did not appear to have been drinking, but he had a funny look in his eyes and "looked like he didn't feel good when he walked in." Deceased seated himself on a stool at the bar. Attendant served him a beer. Deceased took a few sips of the beer and fell backwards off the bar stool. The attendant and others picked him up and seated him in a booth. The attendant did not notice any "injuries" at the time, but deceased appeared to be sick. She called an ambulance. When the ambulance arrived, deceased protested against going to the hospital. At tendant called the wife of the deceased. The wife, Hazel Grubb, and her son helped the deceased into an automobile and removed him from the bar.

When Mrs. Grubb arrived at the bar, the deceased was seated in a booth. He had a wild look about him and his eyes were bugged out.

Mrs. Grubb transported her husband to the Oklahoma Osteopathic Hospital where he was examined by an intern, Dr. T. He was not admitted to the hospital and no tests or x-rays were made.

Dr. T. testified that some of the relatives told him that the deceased had consumed four quarts of beer and he diagnosed the deceased's condition to be "cerebral claudication due to alcohol intoxication." No tests were made to determine the alcoholic content of deceased's blood,

although the hospital was equipped to make such tests.

Deceased was not treated at the hospital and was dismissed. The total charge of the hospital and Dr. T. was $3.00 for use of the emergency room.

Mrs. Grubb took her husband home. He remained in bed during the night. The next morning his condition was unchanged. His face was red, his eyes bugged out, and the place on his head was still red, swollen and puffy.

On Sunday morning, October 11, 1964, deceased was admitted to Hillcrest Hospital where he was treated by Dr. L. and Dr. C., principally by Dr. C. He remained a patient in Hillcrest Hospital until his death on May 10, 1965.

Dr. C., a neurosurgeon called as witness by the claimant, first examined the deceased on October 13, 1965. He secured a history direct from the deceased. The deceased told Dr. C. that while working on October 9, 1964, he raised up and struck his head on a nipple on a cylinder. Later, in talking to other members of the family, Dr. C. learned that on October 10, 1964, the deceased had fallen in the bar. Dr. C. made a complete neurological examination of the deceased, checking his mental status, his reflexes, cranial nerve responses and use of limbs. He made x-rays of the skull, also pneumoencephalographic, PEG and electroencephalographic tests. On October 16, 1964, Dr. C. performed a carotid arteriogram.

As a result of these tests and examinations, Dr. C. found that deceased had a large blood clot or subdural hematoma on the left side of his brain. He also found a linear nondepressed fracture in the right occipital region, the right back of the head.

Dr. C. testified that in his opinion the linear fracture might have been caused by the striking of the head in the fall from the bar stool, but it was not related to the blood clot on the left side of the brain. He explained that if the clot had been caused by the blow causing the fracture,

it would have formed on the right side near the fracture. He stated that in his opinion the clot on the left side was caused by the deceased striking his head while at work on October 9, 1964.

Dr. C. performed a surgical operation on the head of the deceased. He made small ten cent size burr openings in the skull. He attempted to wash the clot from the surface of the brain, but this procedure failing, he made a scalp flap, horseshoe shaped, and removed the clot in pieces. After the clot had been removed, it left a bruising of the underlying cortex of the brain.

Deceased's condition after the operation grew progressively worse. He could not void himself and it was necessary to use a catheter to eliminate the urine from the bladder. He remained bedfast because of weakness in his limbs. He was fed by the use of tubes and intravenously. He finally developed a chronic infection of the bladder, kidneys, and urinary system. He expired on May 10, 1965.

Dr. C. found deceased's condition and death to be consistent with the history furnished by the deceased of having sustained a blow on his head while working on October 9, 1964. He testified that actual cause of the death of the deceased was the head trauma and the degeneration he sustained in this hospital was secondary, although consistent with the sub-acute hematoma with the bruising of the brain.

Dr. S. testified in answer to a hypothetical question propounded by the claimant that as a result of hitting his head on October 9, 1964, deceased sustained a subdural hematoma which developed gradually and quite likely caused the fall in the bar, but was the direct cause of the death of the deceased, his later complications and infections in the hospital being secondary.

Kenneth Wayne Grubb, son of the deceased, saw his father lying in bed at about 5:00 P.M. on October 9, 1964. Witness observed a puffed spot on the top of his father's head.

David D. Grubb, son of the deceased, observed his father lying on a couch on Saturday morning, October 10, 1964. Witness observed a raw looking place on the top of his father's head and his mother applying wet cloths to the place.

Mrs. Erma Messimore, next door neighbor of the Grubbs, called at the Grubb's home at around 2:30 or 3:00 P.M. on October 9, 1964, to borrow some spice. She observed deceased sitting in a chair. His face was pale. His eyes looked glassy. There was an injured spot on the top of his head which was bleeding. He complained of a headache and pointed to the top of his head.

The only evidence submitted by the respondent contradicting the occurrence of the accident as stated by the deceased was the testimony of a fellow workman who testified that he did not see the deceased sustain an accident and the deceased made no complaint to him of pain or having sustained an accident.

Respondent submitted no medical evidence with the exception of the statements alleged to have been made by the deceased to the intern at the Osteopathic Hospital and the finding made by the intern.

Respondent contends that the remarks made by the deceased to the two workmen as he was leaving the plant regarding his having hit his head while working on the job were not admissible under the res gestae rule and were hearsay.

■ We have held that the question of admissibility of statements as a part of the res gestae is largely dependent on the facts and circumstances presented in each particular case. Gulf Oil Corporation v. Harris, Okl., 425 P.2d 957; Sinclair Oil and Gas Co. v. Cheatwood, Okl., 350 P.2d 944; Huffman v. Gaylor, Okl., 267 P.2d 564; Henry Chevrolet Co. v. Taylor, 188 Okl. 380, 108 P.2d 1024; Feenberg Supply Co. v. Pierce, 185 Okl. 662, 95 P.2d 640; Margay Oil Corporation v. Jamison, 177 Okl. 433, 59 P.2d 790.

■ This court follows the rule of liberal construction in regard to the application of the res gestae rule in Workmen's Compensation cases. Gulf Oil Corporation v. Harris, supra; Henry Chevrolet Co. v. Taylor, supra.

The facts here are strikingly similar to those presented in Gulf Oil Corporation v. Harris, supra, where we said:

"* * * The statements of decedent (made to his wife upon his arrival from work) appear to have been the usual and natural expressions and exclamations of such person and spontaneous manifestations of his bodily condition naturally flowing from such condition as opposed to being deliberate, narrative descriptions of past events. Such statements were seemingly induced by the occurrence of the events surrounding the occasion and spoken while decedent was under the influence of pain, shock, and excitement and at the point of death."

■ The statements made by the deceased to the workman were spontaneous and made while he was in pain and concerned with his injury. As he was leaving the premises in response to an inquiry by a workman, "How are you, Bob", he promptly replied, "Well, I'm not doing too good. I raised up under that old unit back there and bumped my head." The statements were admissible under the res gestae rule.

Other evidence submitted at the trial is consistent with the accident having occurred as related by the deceased. A few hours after the deceased told the workmen that he had hit his head, he staggered and fell while leaving a grocery store. The next day he fell backwards off a bar stool. For a period of approximately forty-eight hours and until he was admitted to the hospital deceased suffered severe headaches, was in pain, and was unable to walk without assistance. All of this evidence supports the statements made by the deceased to the workmen that he hit his head while at work.

The medical evidence is positive and uncontradicted that as the result of the blow deceased received on his head, a blood clot

developed on his brain resulting in his complete disability and his death.

Respondent contends that the trial court erred in permitting Dr. S. to answer the hypothetical question propounded to him by counsel for the claimant. Counsel for the respondent interposed a general objection and also a specific objection that the question assumes a state of facts not in evidence, did not include all the clinical or medical findings, and calls for an answer based on "speculation, conjecture, and surmise." Counsel did not point out with particularity wherein the question deviated from the facts presented at the trial. After Dr. S. had answered the hypothetical question, he was cross-examined extensively by counsel for the respondent. We have examined the hypothetical question and no facts were included therein not supported by evidence. All material portions of the hypothetical question were covered by direct questions propounded by respondent's attorney.

 In Ada Coca-Cola Bottling Co. v. Asbury, 206 Okl. 269, 242 P.2d 417, we said:

"A hypothetical question is sufficient if it fairly states such facts in evidence as are relevant and material and sufficient to the formation of an accurate opinion by the witness. It is not an improper question because of an omission of undisputed facts when such facts are not material and essential to the formation of an intelligent opinion covering the matter in question."

The question was in proper form and in accord with the evidence. The court committed no error in overruling the objection of the respondent to the question. Kansas City Southern Ry. Co. v. Haynes, 320 P.2d 404, 411; Ada Coco-Cola Bottling Co. v. Asbury, supra.

Respondent cites the case of Southwestern Bell Telephone Company v. Nelson, Okl., 384 P.2d 914, and contends it is controlling. The case is not in point because of the obvious difference in the facts. In the Nelson case, Nelson's wife asked him, "What's the matter with you?" He replied, "Oh, I'm just tired." He then related the manner in which he did a "routine job." He did not relate that anything unusual occurred precipitating an accident or disability. His statements "were not spontaneous and instinctive while under shock and were not admissible as res gestae," said the court.

We have carefully examined the entire record including the briefs of the parties and note that no contentions other than those hereinabove specifically discussed were made, or urged by petitioners.

The awards in cases D–33873 and D–35544 are sustained.

DAVISON, WILLIAMS, BLACKBIRD, and BERRY, JJ., concur.

JACKSON, C. J., and HODGES and McINERNEY, JJ., dissent.