GULF OIL CORPORATION and The Travelers Insurance Company, Petitioners,

v.

Pauline Gladys HARRIS and The State Industrial Court, Respondents.

No. 40435.

Supreme Court of Oklahoma.

Jan. 24, 1967.

Rehearing Denied March 7, 1967.

Looney, Watts, Looney, Nichols & Johnson, Oklahoma City, for petitioners.

George E. Fisher, Oklahoma City, amicus curiae.

Dick Bell and Frank Seay, Seminole, Charles R. Nesbitt, Atty. Gen., for respondents.

WILLIAMS, Justice:

Under review in this original action is the State Industrial Court's award of death benefits to the widow of a deceased workman.

The record shows that decedent, a pumper serving employer near Meeker, had under his charge approximately twenty-seven oil wells; that he worked five days a week, approximately eight hours a day; a co-pumper had an additional 30 or so wells to pump; that when his co-pumper would have a day off decedent took charge of the additional thirty wells regularly assigned to that co-worker; that on Saturday, December 13, 1958, because of the co-pumper having his customary day off duty, decedent was responsible for all fifty-seven wells; that such day was very cold; that there was an appreciable accumulation of ice and snow; that about 8:00 or 8:30 A. M. decedent left his home in his pick-up truck to service the wells; that he took his lunch this day; that such truck was equipped with an engine-starter operated by car battery which was used to start the engines of the several wells; that he returned home about 12:30 P. M. complaining of severe pain in his chest; and that he died a few minutes later as a result of a coronary occlusion.

The cause of decedent's cardiac episode formed the principal issue before the trial tribunal. Claimant, decedent's widow, sought to attribute the fatal attack to strain and physical exertion from cranking an engine by hand on the morning in question at one of employer's well sites. She testified that decedent returned to their home on the day here involved after being away at work for four and one-half hours and further testified as follows: [That at that time]

"A: He was cold, and he was blue around the eyes, and around the mouth.

"Q: Did you learn from him there that there was anything wrong with him?

"A: Yes.

"Q: Did he make gestures or demonstrate to you anything?

"A: He said he had a sharp pain in his chest.

"Q: Did he inform you anything about where he had had this trouble?

"A: Yes, he said while he was working."

\* \* \* \* \* \*

"Q: Did you call the doctor?

"A: Yes.

\* \* \* \* \* \*

"Q: And by the time he [doctor] got there, was Mr. Harris dead?

"A: Yes, sir, I think he was."

\* \* \* \* \* \*

"Q: Mrs. Harris, you testified a little bit ago that Mr. Harris came, and you testified that he was purple, blue around the mouth. Did he make any statement right then to you as to what he had been doing?

\* \* \* \* \* \*

"A: Yes.

"Q: What did he say he had been doing?

"A: He said he had been cranking on this motor. First, he said he had been working. I said, 'What do you mean, working?' He said 'I have been cranking this motor.' I said, 'How come you didn't use the starter?' He said, 'They were all frozen up and the starter would not do any good.'

"Q: Mrs. Harris, did he tell you how long?

"A: He said forty-five minutes. It would have been more or it could have been less. He said forty-five minutes. I don't know if he meant he cranked forty-five minutes, or he cranked and worked altogether forty-five minutes."

This testimony was admitted over the employer's objection.

Mr. Cooke, employer's production foreman, testified that he visited Mrs. Harris within two or three hours of the death of

her husband and discussed the matter with her. Her testimony continued, as follows, to-wit:

> "Q: And did she give you any narrative relation, such as she has recited here, about what he had related to her about the well?
>
> "A: Yes, uh-huh."
>
> \*   \*   \*   \*   \*   \*
>
> "Q: Why do you provide a starter?
>
> "A: Too many back injuries and hernias and things you get with starting engines, they claim.
>
> "Q: Do you think that is because of the unusual exertion that is required [by cranking] to start them?
>
> "A: That's possibly true.

Dr. B testified of effect that Mr. Harris had reported that he had cranked one of the motors and that a sacroiliac lesion the doctor found was by Mr. Harris ascribed as to causation thereof to such activity.

Mr. Polk, decedent's co-worker, testified that after decedent's death he checked the wells he and decedent serviced; that two or three of the wells were not operating; that "There was two wells in particular. One of them was the Henthorne Estate No. 1, and there was a lot of tracks in the snow there, and there was also on the Calvin Hill, I don't remember that well number, it was either 1 or 2, but there was a lot of tracks and snow was all tracked down around the well, the engine, and both wells was down and I started them both." In answer to the question, "But if you can't start them with your starter or your starter doesn't work, then it is necessary to use the crank?", he stated, "Yeah, in some occasions". He further testified that:

> "\*   \*   \* It was down and I started it and went on and made my rounds and also started that Henthorne well and made my rounds, and came back and the Calvin Hill was down again and I started it again."
>
> \*   \*   \*   \*   \*   \*
>
> "Q: And do you know that you saw evidence of where Mr. Harris had been

attempting to start some of the motors there that morning?

> "A: That's right.
>
> "Q: Now whether he started them or not, you don't know?
>
> "A: I do not know.
>
> "Q: But you are positive about the fact that he is the only one that was out there that day?
>
> "A: That's right.
>
> "Q: And the tracks and the evidence that you saw around those motors were indicative to you that he had had some kind of trouble at least at one of the wells?
>
> "A: That's right.
>
> \*   \*   \*   \*   \*   \*
>
> "Q: And all of you have, even though the company didn't want you to do that, you do have a crank there for for the purpose of starting it if your starter won't work or when you are unable to start it with the self-starter, isn't that correct?
>
> "A: Yes. Well, the cranks come with the engines before we got the starters, electric starters."

Mr. Harris's son testified that on occasion he had seen the deceased crank different ones of the various motors.

As shown in the foregoing recitation and from other facts in evidence, we have the following facts and circumstances in this case, to-wit: (1), According to claimant, the deceased, over a period of 1½ or 2 years, had been going to doctors with chest pains; (2), on the day in question the decedent ostensibly had more than twice as much work to do (some 57 wells to get and/or keep going as against his usual 27), and that, without any help from other workmen; (3), he had to work outside in the accumulated ice and snow, where it was very cold; (4), decedent was the only person who had been out on the lease that day (working and making tracks around) until Polk, after decedent's death was reported, was sent to finish decedent's assignment for the day; (5), the deceased apparently had

made a lot of tracks around at least two, possibly three, of the stationary engines; (6), these facts indicated considerable physical activity and movement around the wells by decedent; (7), the employer thought it better for the workmen to use battery-operated starters, than to crank them by hand; (8), according to its production foreman, the employer furnishes battery-operated starters to the men who start and tend its pump-engines to save them from the unusual exertion that is required to crank them and to prevent the men having back injuries, hernias "and things you get with starting engines"; (9), decedent had been provided with such a starter; (10), the gasoline motors were more difficult to start on a cold day; Mr. Sowers, a former Seminole County Sheriff, being a graduate engineer with many years oil-field experience and then Assistant State Labor Commissioner, employer's Superintendent Cooke, Dr. B, Mr. Harris's son and his co-worker, Polk, all testified of effect that cranking such a pump-engine, more especially on a cold day, was strenuous work; (11), even after being started, the engines on occasion would quit and have to be started again (e. g., the Calvin Hill well 1 or 2, that being one of the very wells around which witness Polk found decedent evidently had worked and made a lot of tracks); (12), when the pump-engines could not be started with a battery-operated starter, a workman would have to crank them by hand; (13), that, when he deemed it necessary, deceased would not refrain from cranking the motors out of deference to his condition of health; (14), the cranks were inserted into the motors at about elbow height; (15), this cranking process included removing the spark-plug from the motor, pouring some gasoline into the firing-chamber, replacing the spark-plug, inserting the crank and quickly turning the full weight of the motor by hand with the crank; (16), this would entail having to move and twist and strain and struggle, about, (giving one explanation for all the tracks Polk found when he went on duty); (17), the concern which sup-

plied the employer with the pump-engines furnished cranks with the individual motors, which cranks were stored for use "next time" underneath the respective motors; (18), the decedent experienced the beginning of his cardiac episode between the time he left for work and his return, some 4 hours later; (19), he came home some 5 hours earlier than usual, (under circumstances warranting the State Industrial Court in determining a recognition on his part of some abnormality in his physical condition); (20), decedent's wife found decedent, upon his early arrival home, to be cold, blue and purple around the eyes and around the mouth, complaining of a sharp pain in his chest; (21), acting as a normal wife, concerned for her husband's welfare and based upon her observation of him and his statements, the wife called a physician; (22), Mr. Harris died before the physician arrived; (23), based upon his assumption that decedent had strained himself out in the cold by cranking pump-engines, the physician gave his opinion in evidence that the workman died as a result of his cardiac episode, induced by strain and exertion caused by his unusual activity in conjunction with the elements (severe weather).

The question is, (1), whether the wife in her proof showed enough circumstantial evidence by way of facts and circumstances together with the physician's opinion to demonstrate reasonably to the Industrial Court that claimant's decedent had his coronary attack as a result of his strenuous work, or, if not, (2), whether the wife may lawfully be heard to report to the trial court as a part of the res gestae that her husband, soon after his cardiac episode had commenced but also shortly before his death, then said he had this pain (which he had already reported to her that he had) "while he was working" and, by way of accounting for his blue and purple appearance about the mouth and eyes, further said that "they [the motors] were all frozen up and the starter wouldn't do any good," and that he had "been cranking on this motor," "forty-five minutes", all as a basis for the

expression of medical opinion as to cause of deceased's death, or, (3), whether based upon all the foregoing facts and circumstances and alleged "res gestae" evidence claimant may be permitted to recover.

We here note that in our opinion in Young v. Neely, Okl., 353 P.2d 111, 113, wherein was involved the situation of a workman being discovered lying dead, across the lower wire of a fence located on the lease where he had worked and between an operating motor he apparently had just started and one not operating but toward which he apparently had turned, this Court in sustaining an award in favor of decedent's widow, stated:

"Strain and exertion arising out of and in the course of employment constitutes ipso facto an accidental injury. Choctaw County v. Bateman, supra [208 Okl. 16, 252 P.2d 465]. It may be proved either by direct or circumstantial evidence alone. In Marby Construction Co. v. Mitchell, Okl., 288 P.2d 1108, 1110, it is stated:

" 'In a workmen's compensation case, it is not required that the claimant shall establish his right to an award by direct evidence alone, or that he produce an eyewitness to the accident. Circumstantial evidence may be used to establish the claim, and it is not necessary that the circumstantial evidence should rise to that degree of certainty as to exclude every reasonable conclusion other than that found by the trial court.' "

From a consideration of all of the facts and circumstances in this case, including but not limited to those heretofore enumerated, we are of the opinion that the award made to the claimant has been reasonably established by direct and circumstantial evidence.

An issue presented by the argument of the parties is whether there was competent evidence that decedent had tried to start a pump engine by hand-cranking which could form the basis for the hypothetical question presented to claimant's expert medical witness that assumed that decedent

had made such effort. The employer contends that the activity so described and included in the hypothetical question did not stand established as a fact by competent evidence, direct or circumstantial. The claimant contends that the statements made to her by decedent immediately prior to his death from a coronary occlusion which related the circumstances surrounding the onset of his pain were properly admitted as a part of the res gestae and therefore competent evidence. We agree with the claimant's contention.

In Sand Springs Ry. Co. v. Piggee, 196 Okl. 136, 163 P.2d 545, 547, we stated:

"It is sometimes difficult to determine as to whether certain statements which would be otherwise inadmissible under the hearsay rule are admissible as part of res gestae. It may be said generally that in order for such statements to be admissible they must be made at or near the time of the occurrence of the accident, they must have been spontaneously made, they must have been provoked or influenced by the happening of the accident itself so as to become a part thereof; if made in relating a past occurrence or event they are inadmissible. Missouri O. & G.R. Co. v. Adams, 52 Okl. 557, 153 P. 200; Chicago, R.I., & P. R. Co. v. Foltz, 54 Okl. 556, 154 P. 519; Schaff v. Coyle, 121 Okl. 228, 249 P. 947; Sears, Roebuck & Co. v. Robinson, 183 Okl. 253, 80 P.2d 938."

In Henry Chevrolet Co. v. Taylor, 188 Okl. 380, 108 P.2d 1024, 1027, this Court, in discussing res gestae, stated:

" * * * It seems clear that the statement was admitted upon the theory that it is a part of the res gestae, and we will confine our discussion to the question of whether the statement was properly admitted under the res gestae rule. This rule has been the subject of much discussion by this and other courts. In some jurisdictions the rule has been given a most strict construction, while in others, of which Oklahoma is one, a more liberal view is taken with regard to the

application of the rule. In Margay Oil Corp. v. Jamison, supra [177 Okl. 433, 59 P.2d 790], it was said: 'The question of the admissibility of statements as a part of the res gestae is largely determined by the facts and circumstances of each case, and should in a great measure be left to the determination of the trial court.'

"In view of our numerous decisions upon the question, it is not deemed necessary to enter upon a lengthy discussion of the rule. It is sufficient to say that admission of such statements is justified by the spontaneous nature of the statement, which is in itself a sufficient guarantee of the trustworthiness of such declarations to render them admissible, if they are made under the immediate influence of the occurrence to which they relate, and it is not necessary that the declarations be so strictly contemporaneous with the occurrence to which they relate as to be admissible under the so-called 'verbal act' doctrine, the element of time being important only for the purpose of determining whether the declaration was made when the speaker was under the stress of nervous excitement as a result of the occurrence to the extent that the reflective faculties were stilled and the utterance therefore a sincere expression of his actual impressions and belief. See Wigmore on Evidence (2d Ed.) § 1750. This has been the tenor of numerous Oklahoma decisions upon the question. See Gibson Oil Co., et al. v. Westbrooke, 160 Okl. 26, 16 P.2d 127, 129; Feenberg Supply Co. v. Pierce, 185 Okl. 662, 95 P.2d 640; Shawnee-Tecumseh Traction Co. v. Henry, 110 Okl. 160, 236 P. 894; Herring v. Hood, 55 Okl. 737, 155 P. 253.

"In Feenberg Supply Co. v. Pierce, supra, the court said [185 Okl. 662, 95 P.2d 641]:

" '* * * The facts and circumstances of each particular case must determine the application of the rule. It is sometimes very difficult for the trial court to determine whether the declaration is genuinely spontaneous and instinctive, or not, even though it is made contemporaneously with the happening of the event which the declaration explains, or about which it is made, and necessarily the trial court is given a wide discretion in admitting or excluding such testimony. Standard Accident Insurance Co. v. Baker, 145 Okl. 100, 291 P. 962.' "

It is clear from the above cited reasoning that this Court through a period of years has approved the admission of statements sought to be introduced as part of the res gestae though not occurring contemporaneously with the main or principal fact. In following this reasoning, we have held that a statement made as much as 1 hour after the act it referred to was admissible as long as the evidence indicated the statement "was provoked and influenced by the happening of the event itself and therefore a part thereof." Huffman v. Gaylor, Okl., 267 P.2d 564, 567.

We have also followed the above reasoning in actions arising under the Oklahoma Workmen's Compensation Law. In Rigdon & Bruen Oil Company v. Beerman, Okl., 346 P.2d 169, an action containing a similar fact situation as the case at bar, we held that statements made by the deceased employee to his wife immediately prior to his death from a heart attack which related the activities he had been engaged in and described the pain brought on by such activities were admissible as part of the res gestae. In the cited case, the employee had been engaged for approximately 2 hours in tightening a belt on an electric motor in a power house separate from his residence and the statements ruled admissible were made by the employee to his wife upon his return to his residence.

In Sinclair Oil & Gas Company v. Cheatwood, Okl., 350 P.2d 944, we held that statements made by an employee to a neighbor who drove him to the hospital after such employee had suffered a heart attack while working were admissible. This neighbor had testified that the employee

had stated that he had suffered a heart attack while starting an engine by the use of a rope starter, and further, that he had suffered a second heart attack while climbing a ladder to service oil tanks. In so holding, we cited Sand Springs Ry. Co. v. Piggee, supra, and Henry Chevrolet Co. v. Taylor, supra, with approval.

In Kelley v. Enid Terminal Elevators, Okl., 372 P.2d 589, we again held that statements made by an employee to his wife which related his activities and the pain he presently felt were admissible as part of the res gestae. In *Kelley*, the employee, during extremely cold weather, had attempted to start a tractor by cranking. Some 3 or 4 hours later, he related this activity to his wife and stated that he had a great deal of pain in his chest. Within several hours, he died of a heart attack.

Decisions from other jurisdictions support our liberal interpretation of the rule of res gestae.

In Jacobs v. Village of Buhl, 199 Minn. 572, 273 N.W. 245, the Minnesota Supreme Court held that a statement made by the deceased to a fellow employee some 45 minutes after he was injured, to the effect that he had fallen and injured himself, was admissible as part of the res gestae. In its opinion, the Court stated:

"In the larger cities of this state there are many policemen walking their beats alone, day and night. In every small city and hamlet there is a policeman working alone at night. Night watchmen work alone. Other employees work alone. These employees are subject to numerous possibilities of accidents which may cause conditions that may bring about their death. They do not have a witness with them to furnish proof as to the happening of an accident if the injuries they receive close their lips in death. The number of compensation cases which reach the courts of last resort where the only proof of the accident is the declaration of the injured employee give weighty proof of the truth of the declaration of the Pennsylvania court that to give a strict application of the res gestae rule in compensation cases would defeat the intent of the Workmen's Compensation Law. The purpose of that law is to make each industry take the burden of caring for the casualities caused in its operations. We cannot limit this purpose to cases in which employees who have died from injuries sustained in the line of duty can produce an eyewitness to their accidental injuries. This would defeat both the letter and spirit of the compensation law (Mason's Minn.St. 1927, § 4261 et seq., as amended)."

In Thompson v. Conemaugh Iron Works, 114 Pa.Super. 247, 175 A. 45, the Pennsylvania decision cited in Jacobs v. Village of Buhl, supra, the court held that statements made by the deceased to a fellow employee some time after an injury was sustained were admissible. These statements by the deceased related the circumstances and the nature of the injury. The court stated:

"As stated in Smith v. Welsh Bros. et al., 102 Pa.Super. 54, 57, 59, 156 A. 598, 599: 'In deciding that declarations are admissible under this doctrine, no fixed time or distance from the happening of the litigated act can be established as a standard to determine what shall be part of the res gestae. Each case must stand on its own facts. Com. v. Werntz, 161 Pa. 591, 29 A. 272; Com. v. Stallone, 281 Pa. 41, 126 A. 56; Com. v. Gardner, 282 Pa. 458, 128 A. 87. * * * In this class of cases the rules of evidence are not applied with the same rigor as in litigation before a jury. A strict technical application of these rules would often defeat the chief purpose of the Workmen's Compensation Act [77 PS § 1 et seq.] which is intended to give compensation to employees injured by accidents in the course of their employment. Johnston v. Payne-Yost Const. Co. [292 Pa. 509, 141 A. 481], supra.' "

Also, see Devlin v. Department of Labor and Industries, 194 Wash. 549, 78 P.2d 952.

■ We are of the opinion that the reasoning of the above cited decisions is cor-

rect and is controlling in the instant case. Considering the circumstances under which decedent uttered the statements related by claimant concerning the difficulty he experienced in attempting to start an engine at one of the wells and the onset of his pain, we determine that such statements were admissible in evidence. These statements appear to have been made spontaneously in that they were provoked by pain and suffering and made while decedent was in a state of shock immediately prior to his death.

When the claimant saw her husband, who had taken his lunch with him, come home from work at noon, being about five hours before the time he usually returned home, and obviously ill and in pain, her natural reaction would be to inquire as to what was the matter with her husband and what had precipitated such an outwardly manifested condition. The statements of decedent in response thereto appear to have been the usual and natural expressions and exclamations of such person and spontaneous manifestations of his bodily condition naturally flowing from such condition as opposed to being deliberate, narrative descriptions of past events. Such statements were seemingly induced by the occurrence of the events surrounding the occasion and spoken while decedent was under the influence of pain, shock and excitement and at the point of death.

In view of the above cited decisions, we hold that the testimony of the claimant was properly received.

As this testimony was the basis of the hypothetical question propounded to Dr. B, the employer's contention that such question was based on facts not properly in evidence cannot be sustained. Further, as above intimated, it is clear that claimant's evidence was sufficient to sustain the award of the Industrial Court.

In so holding, we are not unaware of our decision in Southwestern Bell Telephone Company v. Nelson, Okl., 384 P.2d 914. We believe that the rule of such case does not govern here. We are of the opinion that the fact situation in the present case distinguishes it from the cited case in the respects hereinabove noted, namely, and in short, that Mr. Harris's statements to his wife to which we have alluded were made at a place and during the time his cardiac episode was yet in progress, and within minutes before its termination (and his death).

Award sustained.

DAVISON, BLACKBIRD, BERRY and LAVENDER, JJ., concur.

JACKSON, C. J., IRWIN, V. C. J., and HODGES, J., dissent.